IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-02285-RMR-NRN

HARVEST CHURCH, a Colorado Nonprofit Corporation,

Plaintiff,

v.

RESOUND CHURCH, an Oregon Non-Profit Corporation,

Defendant.

RESOUND CHURCH, an Oregon Non-Profit Corporation,

Counterclaim Plaintiff,

v.

HARVEST CHURCH a/k/a HARVEST WORSHIP CENTER, STEPHEN LEE VALDEZ,
VICKIE MAESTAS, and DANIEL VALDEZ,

Counterclaim Defendants.

---

**REPORT AND RECOMMENDATION ON**
**HARVEST CHURCH'S MOTION FOR PRELIMINARY INJUNCTION AND**
**TEMPORARY RESTRAINING ORDER (Dkt. #114) and FORTHWITH MOTION FOR**
**EXPEDITED RULING RE: NEW HEIGHTS ACADEMY LEASE (Dkt. #123)**
**and**
**RESOUND CHURCH'S ORIGINAL AND RENEWED MOTIONS FOR JUDGMENT ON**
**THE PLEADINGS (DKT. ##27 & 91)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter is before the Court pursuant to Orders (Dkt. #28, 82, 117, & 124)

issued by Judge Regina M. Rodriguez referring Plaintiff/Counterclaim Defendant

Harvest Church's ("Harvest") Motion for Preliminary Injunction and Temporary

Restraining Order (Dkt. #114) and Forthwith Motion for Expedited Ruling Re: New

Heights Academy Lease (Dkt. #123), and Defendant Resound Church's ("Resound")

two motions for judgment on the pleadings (Dkt. #27 and Dkt. #91).

Resound's motions asked, in the alternative to a judgment on the pleadings, for a hearing pursuant to Rule105(f)(2) of the Colorado Rules of Civil Procedure. This Colorado state rule allows for an expedited determination where real property is affected by the filing of a notice of *lis pendens*. After holding a Rule 105 hearing, the court is to make factual findings and may enter an appropriate order setting forth the description of the property and specifying that title shall not be affected by judgment on the issues then pending. *See* Colo. R. Civ. P. 105.

On April 28, 2023, the Court held a full day evidentiary hearing addressing Harvest's preliminary injunction request and Defendant Resound's motions for judgment on the pleadings (or Rule 105 hearing request). To facilitate and expedite the admission of testimony and evidence, the Court allowed the Parties to submit written affidavits or declarations of witnesses. Such affidavits or declarations were admitted into evidence. Witnesses who had submitted affidavits or declarations took the stand and, after some preliminary direct questions, were subject to cross examination.[1] This process allowed for the Court to receive the extensive written and oral testimony of 12 witnesses in one day. Most of the exhibits submitted were stipulated, with only a few exhibits being excluded on evidentiary grounds. While the Federal Rules of Evidence do not apply to

---

[1] With the exception of Nancy Valdez, all witnesses who submitted affidavits took the stand and were subjected to cross-examination. Mrs. Valdez felt ill during the hearing. The Court accepted her affidavits into evidence. The fact that she was not subject to cross examination was considered with respect to the weight to be given the testimony. As described below, ultimately Mrs. Valdez' testimony was not dispositive of any issues in the case.

preliminary injunction hearings, *see Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003), certain exhibits were nevertheless excluded out of fairness. In any event, the few exhibits that were excluded were not determinative of the outcome.

The Court has reviewed and considered all submitted affidavits, the admitted exhibits, and the testimony given from the witness stand.

**Background**

Harvest, also sometimes known as "Harvest Worship Center," was founded and shepherded by members of the Valdez family, including founding Pastor Danny Valdez, his wife Nancy, son Steve, and daughter Vickie Maestas. Harvest commenced this action in the District Court for Adams County, Colorado, on August 16, 2022 claiming ownership to what had once been its church property. (*See* Dkt. #1-2.) Harvest filed a First Amended Complaint ("Amended Complaint") on September 1, 2022. Dkt. #6. The next day, Resound, which is run by Luke Reid, filed a Notice of Removal. Dkt. #1. The basis for removal was diversity of citizenship under 28 U.S.C. § 1441(b). *See id.* at 2, ¶ 6.

This dispute involves real property (the "Subject Property") to which the parties—both Christian evangelical churches—claim an interest. The Subject Property is a large church facility located at 2300 West 90th Avenue, Federal Heights, Colorado. The legal description of the Subject Property is "Lot 1, Aposento Alto Church, County of Adams, State of Colorado." Hr'g Ex. A.

The factual allegations are somewhat complicated and will be discussed in more detail below as necessary. Briefly, Harvest alleges that it was the owner of the Subject Property, despite the deed to the property being in the Resound's name. In 2018, as

part of an alleged joint venture or partnership with Resound, Harvest transferred the Subject Property to Resound for less than its true market value. Harvest says that Resound then squeezed Harvest out of the venture. In 2022, Resound sought to sell the multimillion-dollar Subject Property while denying Harvest any of the proceeds. That transaction failed after Harvest filed this lawsuit and filed a notice of *lis pendens* on the Subject Property. Harvest says that it contributed the multimillion-dollar Subject Property to a partnership or joint venture. Now that the venture has collapsed due to differences between Harvest and Resound leadership, Harvest asserts it should be given back the assets that it brought to the venture—namely, the Subject Property.

In the operative First Amended Complaint (Dkt. #6), Harvest brings the following claims:

(1) a declaratory judgment to void Resound's deed due to insufficient consideration;

(2) a declaratory judgment voiding the property transfer transaction due to violation of the statue of frauds and due to negligent misrepresentation;

(3) breach of contract for breach of the purchase agreement;

(4) breach of contract for breach of an alleged joint venture between Harvest and Resound;

(5) breach of contract for breaching the duty of good faith and fair dealing;

(6) fraud/fraudulent conveyance, alleging that Resound made misrepresentations as part of a scheme to defraud Harvest and divest Harvest of the Subject Property;

(7) unjust enrichment, claiming that Resound received a benefit (presumably the Subject Property) under circumstances that would make it unjust for Resound to retain the benefit without paying; and

(8) for quiet title, asking that the Court declare the special warranty deed void and vesting title in Harvest.

Resound, for its part, insists that Harvest merged into and became a congregation of Resound in 2017. Thereafter, Harvest ceased to exist as a functioning entity. As part of the putative merger, Resound acquired the Subject Property from Harvest and title was transferred via a special warranty deed in February 2018. Resound alleges Harvest is fabricating its claim of title to the Subject Property. The special warranty deed filed in the Adams County property records shows that Resound is the sole and exclusive owner of the property. Resound believes the deed is conclusive of the claims in this case (or, at the very least, the quiet title claim).

**The School**

Further complicating this property dispute between the two competing churches is the fact that the Subject Property also houses a school: New Heights Academy. The school is the educational home to more than 100 at-risk children, grades 6 through 12. Many of these children would not attend school but for the presence of New Heights Academy in what is a low-income, high crime area of Adams County that is served poorly by public transportation. New Heights, like the Harvest Church, was organized by and stewarded by members of the Valdez family. As Harvest says in a recent filing, "Harvest and the school are aligned." Dkt. #123 at 2.

Resound, which claims ownership of the Subject Property, has been acting as landlord to New Heights for the past four years. On April 29, 2023, Resound unilaterally terminated the lease for New Heights meaning that, as of June 2023, New Heights will have no home, and the children who attend may not have a place to attend school come fall. There was testimony that without New Heights, many of these children would simply stop going to school at all, both because of lack of transportation and cultural issues relating to many of the students being native Spanish speakers. The status of New Heights and the termination of its lease at the Subject Property prompted Harvest, on April 30, 2023, to file its Forthwith Motion for Expedited Ruling: New Heights Academy Lease (Dkt. #123), asking that the Court issue an order mandating renewal of Harvest's lease with New Heights Academy.

### Standard for Preliminary Injunction

Rule 65 of the Federal Rules of Civil Procedure governs the entry of injunctions and restraining orders. Temporary restraining orders ("TRO") and preliminary injunctions are extraordinary remedies. *See DigitalGlobe, Inc. v. Paladino*, 269 F. Supp. 3d 1112, 1118-19 (D. Colo. 2017); *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010). The right to relief must be shown to be "clear and unequivocal." *DigitalGlobe, Inc.*, 269 F. Supp. 3d at 1118. The moving party must make a showing of: (1) a substantial likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the nonmoving party, and that (4) the injunction would not adversely affect the public interest. *See id.* at 1119; *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).

Some preliminary injunctions require an even higher standard of proof, requiring a "strong showing" both of the likelihood of success on the merits and balance of harms. *See Fish v. Kobach*, 840 F.3d 710, 723-24 (10th Cir. 2016). Such disfavored injunctions include: (1) those that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Id.*

The issuance of a preliminary injunction will typically require the payment of security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. Fed. R. Civ. Pro. 65(c).

### Standard for Judgment on the Pleadings

Under Rule 12(c), a party may move for judgment on the pleadings after pleadings are closed. "Judgment on the pleadings is appropriate only when 'the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" *Concaten, Inc. v. Ameritrak Fleet Sols.*, LLC, 131 F. Supp. 3d 1166, 1171 (D. Colo. 2015), *aff'd*, 669 F. App'x 571 (Fed. Cir. 2016). "The Court accepts all well-pleaded allegations in a complaint as true and views those allegations in the light most favorable to the nonmoving party. The Court also limits its consideration to the four corners of a complaint, any exhibits attached thereto, and any external documents referred to in the complaint if such document is central to the claim and the parties don't dispute the authenticity of the document." *United States v. Wahdan*, 325 F. Supp. 3d 1136, 1138 (D. Colo. 2018).

**Issues in This Case**

Harvest's First Amended Complaint asserts a quiet-title claim, which Resound has answered. The heart of this dispute is ownership of the Subject Property. The questions of who can use the property, who can lease or sub-lease it, who gets the proceeds from any rent on the property, and who is entitled to sell the property, are all on the table. Harvest claims that it was a partner or joint venturer with Resound, with Harvest contributing its church building, the Subject Property, to the success of the venture. With the joint venture having collapsed after the resignation of lead pastor Steve Valdez, and with the Resound Board now unilaterally making decisions about what should be done with the Subject Property (all supposedly to the detriment of Harvest without input from any Valdez family members), Harvest wants its building back.

Resound, for its part, says it is the rightful owner of the Subject Property, having acquired it via special warranty deed in 2018. The transfer of the Subject Property to Resound was part of an ecclesiastical partnership or "merger" between the two churches the started in 2017. The Harvest congregation was re-branded "Resound Church Denver," and Harvest lead pastor Steve Valdez was designated lead pastor of Resound Church Denver and vice-president of Resound Church. Everything was generally working fine until nearly four years later, in 2021–22, when lead pastor Steve Valdez had what has been called a "moral failing." Steve Valdez was asked by Luke Reid to resign from his role as lead pastor and from the Resound Board, which Steve Valdez did.

The COVID pandemic, coupled with the resignation of lead pastor Steve Valdez, along with the sharing of information about Pastor Valdez's fall from grace with the congregation, led to a collapse in church attendance. With few, if any congregants attending (or contributing), the Resound Board (which no longer includes any member of the Valdez family) has tried to make decisions about the future of its Denver asset—the Subject Property. It first tried to sell the Subject Property, but that deal collapsed when this lawsuit was filed. Resound today has found a new tenant—a non-denominational Christian church called "Boost Church." But Resound says that the Valdez family is interfering with Boost's use of the property. Resound seeks a declaration that it is the rightful owner of the Subject Property.

**Arguments of the Parties**

Resound's argument with respect to its motion for judgment on the pleadings is simple: Resound is the title owner of the Subject Property. The special warranty deed signed by Steve Valdez (Hr'g Ex. A), which reflects that the entirety of the Subject Property was conveyed from Harvest Church to Resound on February 21, 2018, and was properly recorded in the Adams County property records on February 26, 2018. According to Resound, per black letter Colorado property law, that should be both the start and the end of the story.

Harvest's argument is much more complicated. Given the lack of formal signed merger documents, Harvest argues that the arrangement between Harvest and Resound was really a joint venture or a "de facto partnership." Harvest claims that Luke Reid and Steve Valdez had a close, confidential relationship ("like brothers"), and Luke Reid made material misrepresentations under false pretenses which induced Steve

Valdez into signing the conveyance documents so as to facilitate a refinancing. Now that the joint venture/partnership has collapsed, the Subject Property should be returned to Harvest. Harvest also argues that the special warranty deed should be found void for lack of consideration or fraud. Harvest also claims that the special warranty deed concealed that the partnership, rather than Resound alone, was the owner of the property, thereby failing to give proper notice to any future buyer or lender, making the deed defective for that reason too. Harvest further argues that Resound and Luke Reid committed fraud by concealing their true intentions, hiding behind the refinance and using false pretenses to take the building. As ultimate relief, Harvest appears to request that the "Resound partnership" be dissolved with all assets reverting to the original owners.

In opposing the motion for judgment on the pleadings, Harvest lists reasons why the special warranty deed "should be declared defective and thus void" including, among others:

(1) the special warranty deed does not reflect the purchase agreement which states only a 50% interest in the subject property is being conveyed;

(2) the special warranty deed was executed on February 21, 2018, so by the time closing was to take place, Resound had already received the subject property;

(3) there is no evidence that any money changed hands from Resound to Harvest, so Harvest never got the $1,054,945 promised in the purchase and sale agreement;

(4)  Harvest was and is still in existence after the alleged conveyance.

*See* Dkt. #42 at 7–11. Unfortunately for Harvest, none of these assertions is accompanied by any persuasive authority, or meaningful or persuasive legal argument.

Harvest also insists that it is entitled to an equitable remedy—a constructive trust—that would result in the return of the property to Harvest. The basis for the claimed constructive trust is an alleged confidential relationship between the two pastors, Steve Valdez and Luke Reid, that caused Steve Valdez to act less vigilantly than he would have had he been dealing with a stranger. Based on this trusting confidential relationship, Steve Valdez entered into the joint venture to create a "super church." Harvest says that the Court, acting in equity, "may impose a constructive trust and make Resound the Trustee for the benefit of Harvest." *Id.* at 13.

In Harvest's preliminary injunction motion (Dkt. #114), Harvest asks that the Court find (or order) the following:

(1) that a joint venture/partnership exists between Resound and Harvest stemming from the Parties' agreements, both oral and written, as well as course of dealing;

(2) that a "confidential close relationship" existed between Luke Reid and Steve Valdez;

(3) that Resound did not have authority to unilaterally remove or evict Harvest from the joint venture/partnership;

(4) that the joint venture/partnership needs to be wound up, now that the joint venture/partnership is terminated and no longer tenable;

(5) that all tenant income be placed in the court registry pursuant to Fed. R. Civ. P. 67, because the tenant proceeds are part of the joint venture/partnership;

(6) that Resound be directed to provide Harvest all financial documentation and accounting relevant to the joint venture/partnership between Resound Church and Harvest Church for the purpose of creating a full accounting of all assets, debts, and liabilities for the joint venture/partnership;

(7) that Resound be required to place all loan proceeds (approximately $5.5 million) into the court registry pursuant to Fed. R. Civ. P. 67, because Harvest was a member of the joint venture/partnership at the time the refinancing loans were obtained;

(8) issue a declaration that the lease agreement with Boost Church is void and remove Boost Church as a tenant because Harvest is a member of the joint venture/partnership and has not agreed to its terms;

(9) that all Boost Church proceeds be placed into the court registry to be held for the joint venture/partnership and managed by a Receiver, pursuant to Fed. R. Civ. P. 66;

(10) that a receiver be appointed to manage the funds in the court registry, or other account, for the benefit of the joint venture/partnership over the monies and subject property until a final determination can be made on the merits of this case; and

(11) that the Court maintain the status quo of the New Heights tenant on the Subject Property, and allow Harvest, as a partner in the joint venture/ partnership to use the property and stop all property alterations, additions, reductions, tenants, or encumbrances of any kind, until the court can make a final determination on the merits of the current litigation.

Finally, Harvest asks that the Court waive any security bond for Harvest on the issuance of any preliminary injunction, in part because Resound has taken all the equity in the Subject Property and Harvest has been "financially decimated" since Resound unilaterally evicted Harvest from the joint venture/partnership. Dkt. #114 at 2–3.

**Summary of Decision**

After review of the pleadings, exhibits, and consideration of the testimony, first, the Court concludes and recommends that Harvest's Motion for Preliminary Injunction be denied. Harvest has failed to establish a substantial likelihood of success on its quiet title or constructive trust claims. Second, the Court recommends that that judgment on the pleadings should enter in favor of Resound with respect to Harvest's quiet title claim and with respect to Resound's request for a declaratory judgment that it is the proper owner of the Subject Property. The Court also recommends that a declaration be issued that the special warranty deed fully conveyed the Subject Property to Resound, and that Harvest's suit will have no effect on Resound's title to the Church Property.

The Court recognizes that, normally, a motion for judgment on the pleadings should be decided based on the four corners of the complaint and the answer, without reference to extrinsic evidence. Here, the Court is convinced by the dictates of Colorado law and the undisputed evidence of the special warranty deed, that title to the Subject Property properly rests with Resound. However, the presentation of evidence and testimony during the preliminary injunction hearing was a useful exercise. That evidence and testimony confirmed to the Court's satisfaction (at least for purposes of a preliminary injunction) that Resound's acquisition of title was not accomplished by any fraud or nefarious conduct on the part of Resound or its leader, Luke Reid. Instead, the

relationship between Resound and Harvest (or Harvest's founders) appeared to have been generally amiable for more than three years until Pastor Steve Valdez resigned from the Resound board in the wake of his personal issues. With his resignation, according to Resound's bylaws, Pastor Steve Valdez was no longer in the position to either influence or veto Resound's decisions relating to the use or disposition of the Subject Property. With the congregation decimated by the effects of COVID-19 and discouraged from attendance, in part, because of publicity surrounding the circumstances of Pastor Steve Valdez's departure, the Resound board was left to make decisions about the future of the Subject Property. No legal nor equitable principle, nor any document presented to the Court, suggests that either Harvest or the Valdez family have any remaining right or entitlement to say what should happen to the Subject Property.

In sum, Harvest's Motion for Preliminary Injunction or Temporary Restraining Order (Dkt. #114) should be denied. Harvest has failed to meet its burden to show a likelihood of success on the merits of the quiet title or constructive trust claims, which failure is sufficient to justify denying the requested preliminary injunction. Judgment on the quiet title action should enter in favor of Resound.

In addition, Harvest's request for a forthwith order renewing the lease for New Heights Academy (Dkt. #123) should be denied. New Heights is not a plaintiff in this case. Resound is the title owner of the Subject Property and if Resound decides it does not want to renew the New Heights Academy lease, that is Resound's prerogative. Whether it is fair, wise, or even "Christian" to terminate the lease of an essential school that serves an at-risk population of children who, as a result of the lease termination,

are likely to drop out and receive no education, is a different question. But no legal or equitable principle that the Court can identify would allow the Court to extend a lease over the objection of its owner.

**Findings of Fact**

1.  Pastor Danny Valdez was a pastor in Sunny Side, Denver from 1975 to 1989.

2.  In 1989, Danny Valdez moved his church, Harvest Church (also called "Harvest Worship Center"), to the location at issue in this case, 2300 W. 90th Avenue, Federal Heights, in Adams County.

3.  In 2001, Pastor Danny Valdez passed leadership of the church to his son, Steve Valdez, who had come back from bible college and joined the Harvest leadership team.

4.  Per the testimony of Steve Valdez, Harvest was a thriving church that had attendance sometimes exceeding 1,000 people on Easter. Over 200 people were baptized in the church in 2016. Pre-COVID, Harvest averaged more than 440 people at weekend services.

5.  Luke Reid founded Resound Church in 2011 in Hillsboro, Oregon.

6.  Steve Valdez met Luke Reid at a 2007 church leadership conference in Las Vegas, Nevada. Over the years they maintained a friendship. From 2008 to 2017, Steve Valdez and Luke Reid would take turns preaching at each other's churches.

7.  Steve Valdez described a close personal friendship that developed with Luke Reid, with the families taking vacations together. Luke Reid, in his own testimony, tried to downplay this relationship. But the evidence, including

photos and postings on social media, lead to the conclusion that Steve

Valdez and Luke Reid did, in fact, share a close friendship. *See* Hr'g Ex. 16

(Instagram post by Luke Reid with picture of himself and Steve Valdez

stating, "I love doing ministry with one of my closest friends in the world . . .").

8.  Luke Reid first mentioned to Steve Valdez a potential affiliation between

    Resound (in Oregon) and Harvest (in Denver) in 2016. The idea was that in

    pooling resources, including church properties, the churches would have

    more ability to raise or borrow money, combining their strengths to "plant"

    new churches and better spread the word of God.

9.  It was also thought that in partnering with Harvest, Resound could share its

    various operating systems to bring greater efficiency to accomplish work in

    the ministry. These would include database and communication software.

10. Eventually, in 2017–18, the two churches brought their combined resources

    together under the name of Resound Church, with Harvest and its Colorado

    location rebranding as "Resound Church Denver," to differentiate itself from

    the Resound Church Portland location.

11. The 31,712 square foot Subject Property had an appraised value between

    $2.75 and $2.975 million in February of 2018. *See* Hr'g Ex. 24.

12. The cash flow and assets of the two churches were combined. This would

    allow for leveraging of the equity in both churches. Luke Reid explained to

    Steve Valdez that "it would be more efficient to have both properties and our

    cash flow on the same books." Hr'g Ex. 11 ¶ 30 (Steve Valdez Aff.). There

    was a single bank account for Resound.

13. The Parties today dispute what to call the joining or collaboration of the two churches. Resound and Luke Reid like to call the joining a "merger." Harvest's witnesses, including Steve Valdez, prefer to call it a "partnership" or a "joint venture." In terms of legal formalities, Harvest's expert C.P.A. witness, Mr. Marsh, accurately described the entire coming-together transaction as "a mess." Due to the lack of formal legal agreements, it was difficult for Mr. Marsh, as a C.P.A., to determine the precise intent of the Parties. Ultimately, whether the collaboration was a called a "partnership," a "joint venture," a "merger," or something else altogether, is irrelevant to the Court's determination of the quiet title question. This is because, as described below, it is undisputed that, in connection with the joining of church resources, title to the Subject Property was transferred to Resound.

14. It is clear that the following occurred during the effectuation of the joinder transaction:

15. Emails were exchanged listing the various conditions for the joining-together. *See* Hr'g Ex. EE. These included that:

   a. Steve Valdez would be the lead pastor of Resound Denver and become vice-president of the Resound board.

   b. If there was ever to be a vote to sell the Subject Property, the Resound board vote would have to be unanimous.

   c. Resound locations would have a "Pastor Emeritus" title for the founding pastors and wives that could be transferred once. Financial compensation would be associated with this title and would have to be

approved by the board. Danny and Nancy Valdez would be emeritus of Resound Denver;

d.  There would need to be a unanimous vote of the Resound board to borrow against the Subject Property.

e.  The President and Vice President would have the ability to appoint and remove board members. The Vice President and President would have to unanimously agree to both removal and appointment.

16. The above-stated conditions ultimately were agreed upon and implemented through incorporation into the Resound Church bylaws, dated October 11, 2018. *See* Hr'g Ex. 27.

17. On February 17, 2017, Steve Valdez circulated to the Harvest board four resolutions for a vote. The four resolutions were: (1) to sell the property at 2300 W. 90th Ave., Federal Heights, Colorado, "and any and all non-property assets to Resound Church for the amount of $1,054,945.00"; (2) that "any and all existing facility contracts between Harvest Church and any other business be transferred to Resound Church"; (3) to "move all Harvest Church personnel to Resound Church"; and (4) "during the transition from Harvest Church to Resound Church," that "giving made out to Harvest can be transferred to Resound Church." Hr'g Ex. D. These resolutions were unanimously approved by the Harvest board. *Id.*

18. These resolutions indicated a stated and clear intention by the Harvest board for the Harvest Church to "transition" to become part of Resound.

19. Harvest and its Denver congregation was re-branded as "Resound Church Denver."

20. The Denver congregation of Harvest continued to attend church at the Subject Property, but they were attending under the name Resound Church, and proceeds from their giving went to Resound.

21. Steve Valdez took on the title of "Sr. Lead Pastor/Vice President" of Resound Church Denver. *See* Hr'g Ex. K.

22. The property transaction by which Resound acquired title to the Subject Property closed approximately a year later, on February 21, 2018. *See* Hr'g Ex. A (special warranty deed). The Parties dispute whether this was a "sale," a "purchase," or a "refinance," and whether Resound paid appropriate consideration for the multi-million dollar property it was receiving from Harvest. The Court finds from the documentation that title was transferred in connection with a refinance, whereby funds generated by the refinancing were used to pay off Harvest's debt on the property and additional loan funds were held back by the lender to be drawn down for improvements on the building and grounds.

23. Ultimately, whether it was a "purchase," a "refinance," or something else, the evidence is incontrovertible that title to the Subject Property actually transferred from Harvest to Resound.

24. On February 21, 2018, Steve Valdez executed the special warranty deed as "Lead Pastor/President [of] Harvest Church." Hr'g Ex. A. The deed

"convey[ed]" to Resound the Church Property described as "Lot 1, Aposento Alto Church, County of Adams, State of Colorado."

25. Steve Valdez warranted that Harvest conveyed "all the estate, right, title, interest, claim and demand whatsoever of the grantor(s), either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances." *Id.* Steve Valdez on behalf of Harvest "for himself, his heirs and personal representatives or successors, d[id] covenant and agree that he shall and will **WARRANT AND FOREVER DEFEND** the above-bargained premises in the quiet and peaceable possession of the grantee(s), his heirs and assigns, against all and every person or persons claiming the whole or any part thereof, by, through or under the grantor(s)." *Id.*

26. Steve Valdez executed the special warranty deed before a notary public. *Id.*

27. Harvest did receive some consideration for the transfer of the Subject Property. Harvest's existing debt on the Subject Property was retired with a new loan and additional cash was generated which was held back to pay for improvements. Through the joinder of the assets of the two churches, Harvest also received the benefit of Resound's operating systems.

28. Before the signing of the special warranty deed, Steve Valdez had executed an "Agreement to Purchase" on behalf of Harvest where he agreed (as signatory for the Seller, Harvest) to sell to Resound (as "Purchaser") a 50 percent interest in the Subject Property for the sum of $1,054,945.00. *See* Hr'g Ex. H. Harvest seeks to make hay of the fact that the purchase agreement states it was for only 50 percent of the Subject Property, when the

special warranty deed subsequently reflected conveyance of 100 percent of the property. But the Court credits the testimony that the "50 percent" in the purchase agreement was an error, based on the fact that up until the time of the closing, the Assemblies of God organization still retained ownership of half the Subject Property. Steve Valdez testified that in order to allow the Harvest/Resound transaction to take place, he had spoken with the Superintendent of the Assemblies of God who agreed to quitclaim the remaining 50 percent interest to Harvest. Steve Valdez had explained to the Assemblies of God Superintendent, "Sir, we're looking to partner with Resound. We need to do a refinance, and in order to do that we have have all of it [the Church Property] come to Harvest. . . . so they released that to us, they gave it to us." Thus, while the purchase agreement (Hr'g Ex. H) may have reflected only a 50 percent ownership transfer, the special warranty deed (Hr'g Ex. A), which was recorded in the Adams County property records, accurately shows that all parties to the transaction intended that 100 percent of the Subject Property was to be conveyed to Resound.

29. That Resound did not pay money out of its own pocket for the property it was acquiring is not especially relevant. Neither is the fact that Harvest may not have realized the full value of the Subject Property in this transaction. By example, the Assemblies of God, *for no consideration*, quitclaimed 50 percent of the Subject Property to Harvest so that Harvest could transfer 100 percent of the property to Resound. *See* Hr'g Ex. B (quitclaim deed). This is evidence, confirmed by the testimony of Luke Reid and undisputed by Harvest's

witnesses, that in connection with church mergers or joinders, property and assets are sometimes transferred without specific or full monetary consideration.

30. Further confirming that there was a complete transfer of title from Harvest to Resound is the notarized "Seller's Affidavit" found in the closing documents, executed by Steve Valdez, describing the Subject Property and confirming that, prior to the transfer, Harvest was the sole owner of the Property. Hr'g Ex. K.[2]

31. It is also undisputed that Steve Valdez had full legal authority from Harvest to convey title to the Subject Property to Resound. Hr'g Ex. P (Statement of Authority).

---

[2] Oddly, on August 26, 2021, after the relationship between the Valdez family and the Resound leadership had soured, the Resound "Global Leadership Team" sent a confusing email to the Resound Denver congregation purporting to explain how Resound came to acquire the Subject Property:

> Resound Church purchased the building not from Harvest but in fact the Latin District of the Assemblies of God in 2017, We did not "take over" Harvest Church or the loan, it was a straight purchase. We got a loan with our existing lender and paid Harvest a sizable amount to purchase the property in Federal Heights. The cost of purchasing the building, making it a Resound Church and deciding to employ all of the Denver staff and paying for a [sic] existing debt was not cheap but it was 100% worth it."

See Dkt. #1-6.

In fact, Harvest was "paid" nothing in terms of cash, and Resound did not purchase anything from the Latin District of the Assemblies of God. This statement is inconsistent with the documentation and the testimony as to what actually had transpired, and further confirms that this entire transaction was poorly thought out (or understood) and even more poorly documented.

32. Internal correspondence between Steve Valdez and his sister, Vickie Maestas, who served as an administrator (Executive Secretary) with Harvest and later Resound, confirmed the understanding that, after the refinancing and conveyance, Resound was the sole owner of the property. *See* Hr'g Ex. Q (email confirming, "Our property is owned by Resound alone.").

33. No formal merger documents were signed and nothing was filed with the Colorado Secretary of State indicating that there was a formal merger of the two churches. Neither were any formal dissolution documents regarding Harvest filed with the Colorado Secretary of State.

34. Nevertheless, all Harvest's property, assets, employees, and contracts were transferred from Harvest to Resound. Subsequently, Harvest Church, for all intents and purposes, ceased to have any meaningful independent existence.

35. By example, prior to the property transaction, the New Heights Academy, which occupied space at the Subject Property, had a lease with Harvest. With the transfer of the Subject Property to Resound, that lease also was transferred over to Resound and Resound became New Heights Academy's new landlord. *See* Hr'g Ex. O at 7 (Addendum B to Lease – listing Resound Church as "Landlord").

36. Resound continued its existence with a campus in Oregon and the campus in Federal Heights, Colorado. Steve Valdez was the lead pastor for Resound Denver and Vice-President and board member of Resound.

37. Acting in the name of Resound, both Steve Valdez and Vicki Maestas were involved in approving draws from the loan funds generated by the refinancing

to make improvements on the Subject Property. *See* Hr'g Ex. R (funding request for contracting work).

38. In September 2018, in connection with getting insurance for the Subject Property, Vickie Maestas confirmed that the Subject Property is "owned by Resound." Hr'g Ex. V.

39. From early 2017 until Spring 2021, the joinder of the two churches appears to have gone well (or, at least, not badly). Luke Reid had the title of Global Lead Pastor of Resound. Steve Valdez had the title of Global Executive Pastor and Vice President of Resound. As of 2021, the Subject Property belonged to Resound, which was governed by a board which included both Luke Reid and Steve Valdez.

40. In the Spring 2021, there were some disputes between Luke Reid and Steve Valdez regarding Luke Reid using money from the shared bank account to pay off debts without the board's consent.

41. In May 2021, the rupture began. Steve Valdez shared with Luke Reid that Steve Valdez had committed what has euphemistically been called a "moral failing." In Luke Reid's view, this was a "profound violation" of Resound's biblical beliefs regarding marriage.

42. Steve Valdez went through an "accountability board" process, which was an agreed form of discipline for the lead pastors of Resound.

43. Beyond the accountability board process, Luke Reid urged Steve Valdez to resign from Resound.

44. Complying with Luke Reid's request, on May 26, 2021, Steve Valdez sent an email letter of resignation to the Resound Board. The letter reads, in part, "At this time I do not feel like I am fit to lead in this season at Resound. My hope and prayer is to be restored and given an opportunity to come back into Resound at the right time and if the leadership sees fit." Hr'g Ex. AA. The letter concludes with the statement "I have surrounded myself with my accountability board of pastors and they feel this is also the right decision. Please accept my letter of resignation.' *Id.*

45. Steve Valdez insists this was not a "true resignation" and he intended to come "fully back" after 9–12 months. Hr'g Ex. 11 at ¶ 61 (Steve Valdez Aff.).

46. In the weeks and months after his resignation, Steve Valdez felt that he was being undermined by Luke Reid and the Resound board, in part because Luke Reid was sharing confidential, personal information about Steve Valdez with others in the Resound Denver leadership team and the staff.

47. On August 2, 2021, Steve Valdez sent a follow-up letter to the board of Resound Church explaining that the decisions made by Resound leadership in discussing Mr. Valdez's situation with church staff were disappointing, and Steve Valdez therefore had made the decision to "disassociate [himself] completely from any further relationship with Resound Church." Steve Valdez wrote, "As much as I had hoped to continue doing ministry with Resound at some point in the future, the actions of this leadership have proven that this is not an organization that I can be associated with." Hr'g Ex. NN at 3. (letter of August 2, 2021).

48. Luke Reid acknowledged having shared information about Steve Valdez's resignation with Church staff and the congregation. Luke Reid testified to his view that Steve Valdez had not been fully candid with the congregation or the Denver leadership team about the reasons for the resignation. So, on August 12, 2021, Resound's global leadership team emailed the entire Resound Denver congregation regarding Steve Valdez's "disassociation" from Resound. The email stated, among other things, that "Steve shared how for a period during Covid he was secretly struggling with addiction, this lack of accountability led to unhealthy and unstable behaviors." Dkt. #122 at 19, ¶ 64 (Luke Reid Decl.). Luke Reid felt that transparency with the congregation was important, in part because of other notorious instances of evangelical churches covering up the moral failings of their leaders.

49. The combination of the COVID-19 pandemic and the communications to the Resound Denver congregation about Steve Valdez's conduct led to a precipitous decline in church attendance at the Denver campus. By the end of 2021, there were almost no members of Resound Denver attending Sunday services. *Id.* at 22 ¶¶74-75.

50. After Steve Valdez's formal resignation from Resound, he was nevertheless requested by Luke Reid to sign certain documents to facilitate a second loan or refinancing on the building, which occurred in July 2021. Steve Valdez signed the documents as requested.

51. Resound tried to sell the Subject Property in August 2022, but the sale collapsed after Harvest sued to stop the transaction. Harvest claimed ownership in the Subject Property and filed a notice of *lis pendens*.

52. On or about August 25, 2021, all staff in the Denver leadership were let go by the Resound board. Email accounts were shut down and access to the church's databases were prohibited. For example, Vickie Maestas, sister of Steve Valdez and daughter of Danny and Nancy Valdez, who had been a church employee since 1997, was given a letter of termination emailed by Resound board member David Crocker, who was in Australia.

53. With a large church property to maintain, no attending members to speak of, and an inability to sell the property, on February 23, 2023, Resound entered into a lease for the property with a new church, Boost Church ("Boost"). *See* Hr'g Ex. 9 (Boost Church Lease).

54. Boost has been given access to Resound's email list and is using that list to contact former Resound Denver congregants (historic Harvest members), urging them to attend the new church. Resound has also given Boost access to the Resound Facebook page (formerly the Harvest Facebook page), which has over 1,700 followers, and Boost is using that Facebook page to communicate with and recruit former Resound Denver congregants to attend Boost.

55. Harvest contends that the e-mail list of congregants and the Facebook page are assets of Harvest which Resound has misappropriated. Harvest also says

that its historic written church records have disappeared from the storage closet where they were kept at the Subject Property.

56. After the collaboration/joinder with Resound in 2017-18, Harvest essentially stopped functioning and became delinquent as a non-profit corporate entity. But, in 2022, after the rift occurred between the Valdez family and Resound, and after Steve Valdez's resignation, Ms. Maestas cured the delinquency and re-activated Harvest again as a Colorado non-profit corporation.

57. Today, Harvest (or its leadership) is essentially the Valdez family. Ms. Maestas testified that the Harvest board consists of Steve Valdez, Danny Valdez, Nancy Valdez, and herself. Ms. Maestas is of the view that the congregation, which had been Harvest's congregation, was "basically kicked out of the church and driven away by Resound."

58. In August 2022, the board members of Resound sent a termination letter to Danny Valdez terminating his position as Pastor Emeritus. This ended the emeritus payments that Danny Valdez had been promised in connection with the collaboration/joining of the churches and which promises were included in the Resound bylaws.

59. Luke Reid testified that the emeritus payments to Danny Valdez were terminated because Danny Valdez (and, implicitly, his family) was "working against the purposes of Resound Church" by interfering with deals that Luke Reid considered to be in the "best interests of the church."

60. The Subject Property currently houses New Heights Academy, with a lease that expires in June 2023. There was undisputed testimony about the critical

importance to the local community of the New Heights Academy and the

HOPE On-line Learning Academy that New Heights provides. The school

serves an at-risk population. Many of the students would not attend school at

all without New Heights, and likely would not obtain a high school degree.

However, New Heights is not a plaintiff in this case. New Heights' lease is

with Resound and Resound has chosen not to renew the lease. Luke Reid

explained his decision to terminate the school lease was because New

Heights' leadership refuses to communicate with Resound's leadership,

rendering the relationship unworkable.

**Conclusions of Law**

The Court concludes that under black-letter property law in Colorado, the special

warranty deed is controlling and conclusively resolves the title question. Resound alone

is the title owner of the Subject Property.

The general rule in Colorado is that real property can only be conveyed by deed.

Colo. Rev. Stat. § 38-10-106. The conveyance-by-deed requirement, combined with

Colorado's "race-notice" recording statute, protects "purchasers of real property against

the risk of prior secret conveyances by the seller and to allow a purchaser to rely on the

title as it appears of record." *Ranch O, LLL v. Colo. Cattleman's Agric. Land Trust*, 361

P.3d 1063, 1068 (Colo. App. 2015). This is consistent with Colorado's general policy

regarding titles to real property that properly recorded instruments should be "liberally

construed with the end in view of rendering such titles absolute and free from technical

defects so that subsequent purchasers . . . may rely on the record title and so that the

record title of the party in possession is sustained and not defeated by technical or strict constructions." Colo. Rev. Stat.§ 38-34-101.

Thus, under Colorado law, a recorded, unambiguous deed, is definitive in terms of determining the intentions of the parties, and "extrinsic evidence to alter vary, explain or change the deed by any such evidence is not permissible." *O'Brien v. Vill. Land Co.*, 794 P.2d 246, 249 (Colo. 1990). In the *O'Brien* case, the Colorado Supreme Court held that where a deed is unambiguous on its face, the nature and extent of interests conveyed thereby had to be determined from the contents of the deed itself, without regard to extrinsic evidence. *Id.*

The special warranty deed executed by Steve Valdez on February 21, 2018 on behalf of Harvest, and later recorded in Adams County, "convey[ed]" to Resound the Church Property described as "Lot 1, Aposento Alto Church, County of Adams, State of Colorado," and "all the estate, right, title, interest, claim and demand whatsoever of the grantor(s), either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances." Hr'g Ex. A. Mr. Valdez, for Harvest, further warranted that Harvest would forever defend Resound's title to the Subject Property. *Id.* at 1. Under Colorado law, the deed and those warranties are conclusive regarding title to the Subject Property. The special warranty deed conveyed the Subject Property in full to Resound.

The Court agrees with Resound that when Steve Valdez executed the special warranty deed as Harvest's President, it became binding and conclusive on Harvest as a matter of Colorado corporate law. *See* Colo. Rev. Stat.§ 38-30-144(2) (establishing that any corporate instrument affecting title to real property executed by the president of

30

the corporation in the form permitted by law, shall be binding and conclusive upon the corporation as to any bona fide purchaser, encumbrancer, or other person relying on such instrument).

As for Harvest's argument that the inconsistency between the language of the deed and the purchase agreement (which spoke of only 50 percent of Lot 1 being conveyed) renders the deed void or voidable, the merger-by-deed doctrine mandates that the legal description in the special warranty deed supersedes the purchase agreement. Under the merger by deed doctrine, a deed delivered and accepted as complete performance of a contract for sale of real estate merges all prior negotiations and agreements into the deed. *Colo. Land & Res., Inc. v. Credithrift of Am., Inc.*, 778 P.2d 320, 322 (Colo. App. 1989). Notwithstanding that the terms of a deed may vary somewhat from that contained in a contract for sale of real property, "the deed is determinative of the rights of the parties." *Reed v. Dudly*, 533 P.2d 507, 508 (Colo. App. 1975).

Here, Harvest's argument that the purchase agreement's contradictory language renders the deed void or voidable is flatly inconsistent with the merger-by-deed doctrine. In addition, as described above, there is a rational explanation for the change, which even Steve Valdez acknowledged—that the entire 100 percent of the Subject Property was to be conveyed to Resound, and the 50 percent language was an error based on the prior one-half ownership of the property by the Assemblies of God. Steve Valdez solved the problem of the Assemblies of God's 50 percent ownership by obtaining a quitclaim from the Assemblies of God.

Harvest opposes Resound's motions for judgment on the pleadings in part because the pleadings have not yet closed, as Harvest has not yet pleaded its answer to Resound's counterclaims pending rulings on motions to dismiss. *See* Dkt. #42 at 1. But pleadings on Harvest's quiet title claim have closed, and there is no reason to delay ruling on this particular claim, a decision on which will dramatically simplify this litigation.

Harvest also opposes issuance of any declaration pursuant to Colorado Rule 105, arguing in part that a trial court does not have authority to release a notice of *lis pendens* while a case is pending in federal court. *See* Dkt. #42 at 2 (citing *Alien, Inc. v. Futterman*, 924 P.2d 1063 (Colo. App. 1995)). But the *Alien, Inc.* case involved a state trial court that had issued an order releasing a notice of *lis pendens* that had been filed in connection with a *different federal court action*. The Colorado Court of Appeals found that to be improper. 924 P.2d at 1070. Here, a federal court is being asked to issue a declaration relating to a notice of *lis pendens* arising from this same litigation (which originated in state court and was then removed). The *Alien* decision has no applicability to the instant case.

Harvest finally argues against entry of judgment on the pleadings based on its claim for a constructive trust. Citing *Page v. Clark*, 592 P.2d 792 (Colo. 1979), Harvest insists that the equitable remedy of a constructive trust can be imposed in respect of "property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." 592 P.2d at 798 (citing *Botkin v. Pyle*, 14 P.2d 187 (Colo. 1932)). Although the operative pleading contains no claim for a constructive trust, there is a pending motion for leave to

amend (Dkt. #78) which would add a claim for a constructive trust, and the preliminary injunction motion is based in part on the claim to a constructive trust.

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Id.* (quoting *Beatty v. Guggenheim Expl. Co.*, 225 N.Y. 380, 122 N.E. 378 (1919)). Where one side is asserting the existence of a constructive trust, "[t]he court must determine whether that relationship is such that the statute of frauds should not be imposed so as to allow the holder of legal title to property to also retain the beneficial interest." *Id.* The circumstances that give rise to a constructive trust may involve a fiduciary relationship. *Id.* For example, the partners in a business enterprise may have such a fiduciary relationship giving rise to a constructive trust. The obtaining of property by fraud may create a constructive trust which will require disgorgement of the wrongfully acquired property. And property that has been obtained by duress may, with the imposition of a constructive trust, be returned to the transferor. In addition, when one party holds a position of superiority over another, or when two parties have a "confidential relationship," a transfer of property obtained as a result of an abuse of those relationships may be set aside. *Id.* "A constructive trust is one that arises when a person, clothed with some fiduciary character, by fraud or otherwise gains some advantage to himself." *Botkin v. Pyle*, 14 P.2d 187, 191 (Colo. 1932).

The burden of proving the existence of a confidential relationship is on the party wishing to set aside the transaction. *Page*, 592 P.2d at 798. "If the existence of the confidential relationship has been established, the transaction may be set aside if that

relationship has been abused. It is not necessary that the abuse of the confidential relationship be the procuring cause of the original conveyance." *Id.* A confidential relationship arises when one party justifiably reposes confidence in another; thus, it may arise from a multitude of circumstances. *Page*, 592 P.2d 792. A "fiduciary duty" may arise from a business or confidential relationship which impels or induces one party to relax the care and vigilance one would and should ordinarily exercise in dealing with a stranger. *Dolton v. Cap. Fed. Sav.*, 642 P.2d 21 (Colo. App. 1981).

The existence of a confidential relationship is simply one of the elements to be considered in determining whether there is fraud, undue influence, overreaching, or other improper conduct that might justify the imposition of a constructive trust. *First Nat'l Bank v. Theos*, 794 P.2d 1055, 1061 (Colo. App. 1990).

Here, for purposes of the preliminary injunction, the Court is not persuaded that the very friendly relationship between Luke Reid and Steve Valdez rose to the level of a confidential relationship that allowed Luke Reid to take unfair advantage or exert undue influence. The evidence shows that Steve Valdez was communicating and consulting with his sister about the terms of the joinder between Harvest and Resound. Steve Valdez also had the ability to seek advice from the Harvest board members, all of whom voted to approve the transfer of Harvest assets to Resound. *See* Hr'g Exh 12 (Aff. of Elias Toby Maldonado, explaining he was a Harvest board member asked back to the Harvest board to assist with the "joint venture and partnership between Harvest and Resound" and confirming that he voted "to sell" the property to Resound). Steve Valdez negotiated protections for his father and himself, such as the title of Pastor Emeritus and associated payments. Steve Valdez also negotiated protections for the Resound

Denver (formerly Harvest) congregation: namely, Steve Valdez would have a position on the Resound board and any sale of the Subject Property would have to be by unanimous board vote. These are not circumstances that lead one to conclude there was undue influence that might justify the imposition of a constructive trust.

Harvest alleges that Luke Reid "concealed his penultimate goal to have the property conveyed to Resound." *See* Dkt. #114 at 26, ¶ 162. But there was nothing concealed about that intention. It was expressly agreed that the Subject Property would be conveyed to Resound, and that was part of the resolution that was unanimously approved by the Harvest board.

Everything appeared to be going relatively well until, by virtue of Steve Valdez's resignation from the Resound board, the protections for the historic Harvest congregation and the founding Valdez family disappeared. This was not a function of undue influence by Luke Reid, but instead was a result of Steve Valdez's resignation from the Resound board.

And there is a second reason why the Court will not use its equitable powers to impose a constructive trust under these circumstances. This is a dispute between two churches, or factions of a church, regarding the disposition of church property. Colorado has adopted the "neutral principles" approach to the resolution of church property disputes. *See Bishop and Diocese of Colo. v. Mote,* 716 P.2d 85, 100 (Colo. 1986). Under this approach, and consistent with the federal constitutional concerns about secular courts making interpretations of church doctrine, *see Jones v. Wolf*, 443 U.S. 595 (1979), a court trying to resolve a property dispute among churches or factions of a church should rely "exclusively on objective, well-established concepts of trust and

property law familiar to lawyers and judges." *Mote,* 716 p.2d at 95 (quoting *Jones*, 443 U.S. at 603–04). This method thereby promises "to free civil courts completely from entanglement in questions of religious doctrine, polity and practice." *Id.*

The neutral principles approach may allow for a conclusion that the beneficial owner of disputed church property is different from the technical title owner. And, in utilizing the neutral principles approach, a court need not restrict itself to a search for explicit language creating an express trust. "Colorado recognizes that the intent to create a trust can be inferred from the nature of the property transactions, the circumstances surrounding the holding of and transfer of property, the particular documents or language employed, and the conduct of the parties." *Id.* In determining whether there was an intent to create a trust, "'clear, explicit, definite, unequivocal and unambiguous language or conduct' establishing an intent to create a trust is required." *Id.*

This case, of course, does not involve the creation of an express trust, nor does it involve the application of neutral principles of property and trust law to infer the intent of the parties to create a trust. Instead, Harvest would have the Court exercise its equitable powers to scrutinize the relationship between two pastors, Luke Reid and Steve Valdez, and conclude that Luke Reid exercised undue influence to improperly effectuate the transfer of church property from Harvest to Resound, and then to further procure Steve Valdez's resignation from the board. Based on such scrutiny, Harvest would have the Court impose a constructive trust that would negate the explicit language of the special warranty deed.

Without concluding that the equitable remedy of a constructive trust should never be available to resolve a church property dispute, the Court holds that, in this instance, it would be inappropriate, under the neutral principles approach, to scrutinize the relationship between Luke Reid and Steve Valdez to assess whether the relationship which was abused to the point that would justify the imposition of a constructive trust. While the Court outlined above the objective evidence indicating that this was *not* a confidential relationship, probing further into the nature of this relationship, and trying to decide whether the relationship between these two pastors was abused, would tread dangerously close to the line which prohibits delving into and assessing the ecclesiastical and spiritual relationships within a church.

At least one other court has made a similar determination that the remedy of a constructive trust should not be available where the claim relies on a supposed confidential relationship between a church leader and its congregants. In *Parent v. Roman Catholic Bishop of Portland*, 436 A.2d 888 (Me. 1981), trustees of the Roman Catholic Lille parish in Maine sued after the bishop, in his capacity as head and pastor of the diocese of Portland, announced that the parish would be merged with a neighboring parish and the church property would be sold. The complaint alleged that a confidential relationship existed between the bishop and the Lille parishioners based on the bishop's position in the church, his promises to provide religious services, and their reliance upon those promises. It further alleged that the bishop had abused that relationship by closing the church, selling portions of the realty, and transferring other property, all without the approval of the parishioners. For relief, the complaint requested the imposition of a constructive trust with respect to all property and assets given to the

church by the parish, which would enjoin the bishop from transferring any property given to the church by the parish. *Parent*, 437 A.2d at 889.

In moving for summary judgment, the bishop argued that the application of the law of constructive trusts would require the evaluation of power and religious doctrines of the Catholic church, in violation of the First Amendment. *Id.* at 890. The Maine Supreme Court noted that the deed unequivocally vested title in the bishop. The court further held that without evidence of some collateral legal obligation between the bishop and plaintiffs which could have been identified without entanglement in religious doctrine or polity, "the Superior Court had no authority to review the bishop's actions with respect to the church property in Lille." *Id.* Even assuming the existence of a confidential relationship between the bishop and the plaintiffs,

> the First Amendment prohibited the Superior Court from deciding whether the bishop abused that relationship so as to justify the imposition of a constructive trust. Such a decision would have required the court to assess the scope of the bishop's authority under canon law and the propriety of his exercise of that authority in this case, matters over which the courts of this State have no jurisdiction.

*Id.*

In this case, the relationship between Luke Reid and Steve Valdez is alleged to have spanned from before the creation of the alleged joint-venture/partnership in 2017–18, to Steve Valdez's resignation from the Resound board at Luke Reid's request in 2021. So, even assuming this were a confidential relationship, the supposed abuse of that alleged confidential relationship involved not only the procurement of Steve Valdez's signature on all the transaction documents at the time of the joining of the churches, but also to Steve Valdez's resignation from the Resound board. It was Steve Valdez's resignation from the Resound board that allowed the board to make decisions

about the sale (or leasing) of the Subject Property without the involvement of Steve Valdez or his family. The resignation was requested, in part, because Luke Reid believed that Steve Valdez's misconduct "was an egregious violation of Resound's religious beliefs" and an abuse of Steve Valdez's "power as pastor of Resound Church." Hr'g Ex. QQ (Luke Reid Decl. ¶ 63).

For this Court to attempt to assess whether this relationship between two pastors had been "abused," especially in the context of one of the pastors arguably violating church doctrine which justified church discipline, would necessarily require the evaluation of church doctrine, practice, and disciplinary procedures, which is precluded by the First Amendment. After all, Steve Valdez says today his resignation was not necessary, in part because he had answered to his accountability board. Yet, he nonetheless resigned after being pressured by Luke Reid. It would be inappropriate for the Court to try to delve into these necessarily religious matters to determine the role of the accountability board, whether the resignation was or not mandated by doctrine, or whether Luke Reid's pastor-to-pastor "pressure" to resign amounted to "duress" or abuse of the confidential relationship sufficient to justify imposition of a constructive trust.

Because Colorado law dictates that the unambiguous deed vests title in Resound, and because the Court finds as a matter of both fact and law that the imposition of a constructive trust would be inappropriate in these circumstances, Harvest has not shown a likelihood of success on the merits of its claim to ownership of the Subject Property. In addition, Resound has shown that it is the proper owner of the Subject Property.

## CONCLUSION

For the reasons outlined above, it is hereby **RECOMMENDED** that:

- Harvest Church's Motion for Preliminary Injunction and Temporary Restraining Order (Dkt. #114) by **DENIED**;

- Harvest Church's Motion for Ruling Regarding New Heights Academy Lease (Dkt. #123) be **DENIED**;

- Resound Church's Motions for Judgment on the Pleadings and Alternative Motion for 105(f)(2) hearing (Dkt. ##27 & 91) be **GRANTED**;

- Judgment on Harvest's claim to quiet title be entered against Harvest and in favor of Resound; and

- The Court issue a declaration and judgment, consistent with Colorado Rule of Civil Procedure 105(f)(2), declaring that title to the Subject Property described as "Lot 1, Aposento Alto Church, County of Adams, State of Colorado," rests exclusively with Resound Church, the title to which will not be affected by judgment on the remaining issues or claims pending in this action.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148–53**

**(1985), and also waives appellate review of both factual and legal questions.**

***Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*,**

**91 F.3d 1411, 1412–13 (10th Cir. 1996).**

Date: May 11, 2023

_____
N. Reid Neureiter
United States Magistrate Judge