IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

HARVEST CHURCH, a Colorado Nonprofit Corporation,

     Plaintiff,

v.

RESOUND CHURCH, a/k/a WAY CHURCH, a/k/a RESOUND COLLECTIVE, an
Oregon Non-Profit Corporation,

     Defendant.

RESOUND CHURCH, a/k/a WAY CHURCH, a/k/a RESOUND COLLECTIVE, an
Oregon Non-Profit Corporation,

     Counterclaim Plaintiff,

v.

HARVEST WORSHIP CENTER, STEPHEN LEE VALDEZ, VICKIE MAESTAS, and
DANIEL VALDEZ,

     Counterclaim Defendants,

STEPHEN LEE VALDEZ and DANNY VALDEZ,

     Counterclaim Plaintiffs,

v.

RESOUND CHURCH, a/k/a WAY CHURCH, a/k/a RESOUND COLLECTIVE,

     Counterclaim Defendant.

---

**ORDER ON HARVEST PARTIES' MOTION TO CLARIFY AND AMEND PROTECTIVE
ORDER PURSUANT TO FED. R. CIV. P. 26(c) (ECF Nos. 283 and 284)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter comes before the Court on the Harvest Parties' Motion to Clarify and Amend the Protective Order Pursuant to Fed. R. Civ. P. 26(c) ("Motion to Clarify and Amend). ECF Nos. 283 (restricted version) & 284 (public version). The Protective Order is found at ECF No. 161. The Motion to Clarify and Amend was filed on December 26, 2025 and referred by Judge Regina M. Rodriguez on the same day. ECF No. 285. The Resound Parties filed a response to the Motion to Clarify and Amend on January 14, 2026. ECF No. 291. The Harvest Parties filed their reply on January 21, 2026. ECF No. 292. The Court heard argument on the motion on March 6, 2026. *See* ECF No. 293. The Court will **DENY** the Harvest Parties' Motion to Clarify and to Amend.

## I.    Background

This was a hotly contested, extremely contentious lawsuit between the founders of Harvest Worship Center (the Harvest Parties) and the organizers of Resound Church (the Resound Parties) and their respective entities. Briefly, it was alleged by the Harvest Parties that the Resound Parties had improperly taken over the Harvest church and the church's property. Various allegations, claims and counterclaims were leveled back and forth between the Parties and the respective church leaders. Claims included breaches of contract, breaches of joint ventures, breaches of duties of good faith and fair dealing, fraud, unjust enrichment, and for quiet title to certain church property, among others. The Court held an evidentiary preliminary injunction hearing. *See* ECF Nos. 146–148.

As the case progressed to discovery, the Parties filed a Joint Stipulated Motion for Protective Order, ECF No. 158, which the Court granted; the Protective Order was entered on June 9, 2023. *See* ECF No. 161. The Protective Order recognized that the Parties possessed "certain information, documents, and other materials that are

2

confidential or contain sensitive data or information, proprietary or nonpublic

information, or information involving privacy interests that may be subject to discovery,

but that should not be made publicly available." *Id*. at 1. The Protective Order provides

that the Parties could designate certain information as "Confidential" and that any

information so designated "shall not be used or disclosed for any purpose except the

preparation and trial of this case, and Confidential information shall not be disclosed to

anyone except as expressly set forth herein." *Id*. at 1–2, ¶ 1. It further states that within

> 60 days after the conclusion of all aspects of this action, documents marked Confidential in accordance with this Order and all copies thereof shall be destroyed or returned to counsel for the producing party. The party complying with this provision shall notify the producing party, in writing, that it destroyed or returned Confidential documents or materials received from the producing party.

*Id*. at 3, ¶ 6. Following the termination of the litigation, the provisions of the Protective

Order relating to the protection of Confidential documents were to remain in full force

and effect, and the Court would retain jurisdiction over all persons provided access to

Confidential documents or materials with respect to enforcement of the terms of the

Protective Order. *Id*. at ¶ 12.

The Parties settled the case and then stipulated to the dismissal of all claims and

counterclaims on November 18, 2025. *See* ECF No. 280. The case was terminated the

next day. *See* ECF No. 218. With the dismissal and termination of the case, the

provisions of the Protective Order regarding return or destruction of confidential

documents were set to kick in. On December 24, 2025, with the deadline for destruction

of confidential documents running, the Harvest Parties filed their Motion to Clarify and

Amend. *See* ECF Nos. 283 (restricted version) & 284 (public version).

3

## II.    The Harvest Parties' Motion to Clarify and Amend

The Harvest Parties explain that materials disclosed by the Resound Parties included multiple years of Resound Church's Quickbooks and accounting files. The Harvest Parties believe this information demonstrates substantial criminal conduct by Resound Church and/or its leaders in relation to income taxes or income tax reporting. ECF No. 283 at 3. The Harvest Parties ask to clarify or modify the Protective Order so that they can report to "the proper authorities . . . what is believed to be criminal conduct." *Id*. at 5. In sum, the Harvest Parties seek "specific amendments to the protective order for the limited purpose of permitting an exception for reporting of believed criminal conduct using Confidential and AEO [Attorneys Eyes Only] materials, consistent with public policy and state laws and to not destroy the relevant discovery documents needed to demonstrate that any reporting is done in good faith." *Id*.

The Harvest Parties argue that it is consistent with the law and public policy of the state of Colorado to be able to report criminal activity. The Harvest Parties cite Colo. Rev. Stat. § 18-8-115, which states, "It is the duty of every corporation or person who has reasonable grounds to believe that a crime has been committed to report promptly the suspected crime to law enforcement authorities." Colo. Rev. Stat. § 18-8-115. And when the person is acting in good faith, such person "shall be immune from any civil liability for such reporting or disclosure." *Id*. Federal law penalizes as misprision of felony the concealment of knowledge of the actual commission of a felony. 18 U.S.C. § 4. The supposed federal felony here is the evasion of taxes. 26 U.S.C. § 7201. The Harvest Parties claim that that they cannot go to law enforcement to report the suspected criminal activity with disclosing the confidential documents because they

4

need "documentary support for any reporting to law enforcement or agencies to demonstrate reliability and good faith." ECF No. 283 at 7.

In addition, the Harvest Parties seek to keep their email accounts and not be required to destroy them. Over the tortured history of the Harvest-Resound relationship and the ensuing dispute, Resound Church and its leaders came into possession and control of email accounts historically owned and used by the Harvest Parties. Harvest's leaders had personal email accounts linked to Harvest and when Resound took over the operation of Harvest, Resound gained control over these email accounts, which included extensive personal emails and information of the Harvest leaders. Once the rupture between the two churches occurred, the Harvest Parties were locked out of their email accounts by the Resound Parties. During litigation discovery, the Harvest Parties regained access to their emails, but the Resound Parties had designated the email accounts as "Confidential" in connection with their production. The Harvest Parties argue that no good cause exists for a Confidential designation of the Harvest Parties' historic emails, which they necessarily either wrote, sent, or received. *See id.* at 5. The Harvest Parties request that they be permitted to keep their email accounts and not be required to destroy them because the accounts "contain many personal emails that are unrelated to any charity operations." *Id*. at 8. The Harvest Parties also point out that they were parties to (or authors of) their own emails, so there is no confidentiality that is being violated by allowing them to keep copies of their own emails. *Id*. Thus, with respect to the emails, the individual Harvest Parties—Steve Valdez, Vivkie Maestas, Nancy Valdez, and Danny Valdez—ask that the Protective Order be modified to allow them to keep and use their email accounts for any purpose.

5

### III.    The Resound Parties' Opposition

The Resound Parties, including its pastor, Luke Reid, strongly oppose the Harvest Parties' Motion to Clarify and Amend. The Resound Parties point out that the Protective Order was agreed to at the beginning of the litigation. The Harvest Parties got the benefit of that agreement by receiving what the Resound Parties call their "most sensitive confidential information," and then induced the Resound Parties to settle the case in reliance on the Protective Order's requirement that such information be returned or destroyed. ECF No. 291 at 2. Having obtained the benefit of the settlement, the Resound Parties argue that the Harvest Parties are trying to eliminate the confidentiality protections they agreed to, so as to "weaponize," post-litigation, the confidential discovery materials. *Id*.

The Resound Parties rely on *S.E.C. v. Merrill Scott & Associates*, *Ltd*., 600 F.3d 1262 (10th Cir. 2010), in opposing the proposed change to the Protective Order. In *Merrill Scott*, the Securities and Exchange Commission ("S.E.C.") had filed a securities fraud suit against a financial consulting firm that allegedly defrauded investors in a Ponzi scheme. 600 F.3d at 1266. After entry of protective orders to safeguard confidential information provided to the S.E.C. by an interested third-party investor, the trial court allowed the United States to intervene to seek modification of protective orders for the purpose of disclosing information to other governmental agencies (the I.R.S.) for investigation of potential tax violations. *Id.* at 1268–69. The interested third-party investor appealed the modification of the protective order to the Tenth Circuit, which reversed and warned that a court, when considering the modification of a

6

protective order, should "examine any tangible prejudice to the party opposing

modification that outweighs the benefits of modification." *Id.* at 1272.

The *Merrill Scott* case involved the production of confidential information from a

third-party witness. Nevertheless, the Tenth Circuit was concerned that unless

protective orders are "fully and fairly enforceable," parties and witnesses relying upon

such orders will be inhibited from providing essential testimony and evidence in civil

litigation, "thus undermining a procedural system that has been successfully developed

over the years for disposition of civil differences." *Id*. (*quoting Martindell v. Int'l Tel. &

Tel. Corp.*, 594 F.2d 291, 295 (2nd Cir. 1979)). "Witnesses might be expected frequently

to refuse to testify pursuant to protective orders if their testimony were to be made

available to the Government for criminal investigatory purposes in disregard of those

orders." *Id*. (quoting *Martindell*, 594 F.2d at 295–96). Importantly, in *Merrill Scott*, the

Tenth Circuit found that the mere assertion of "a law enforcement purpose is

insufficient, without more, to justify actions in derogation of a valid protective order," and

deemed "reliance on a law enforcement rationale as a means of bypassing the

limitations reflected in the protective orders to be unfounded." 600 F.3d at 1273.

## IV.    Decision

"[A]s a sheer matter of power the court has authority to alter the terms of a

protective order it has entered, and . . . ordinarily requests to modify are directed to the

district court's discretion and subject to review only for abuse of discretion." 8 Charles

Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice & Procedure* §

2044. 1, at 575–76 (2d ed.1994); *see also Rohrbough v. Harris*, 549 F.3d 1313, 1321

(10th Cir.2008) ("The modification of a protective order, like its original entry, is left to the sound discretion of the district court.").

Protective orders serve the vital function of "secur[ing] the just, speedy, and inexpensive determination of civil disputes by encouraging full disclosure of all evidence that might conceivably be relevant." *Martindell*, 594 F.2d at 295 (quotation and citation omitted). "This objective represents the cornerstone of our administration of civil justice." *Id*. This being the case, the Tenth Circuit warned in *Merrill Scott* that "courts should be wary of retroactive attempts to modify them in ways that undermine the justified reliance" of parties on a valid order circumscribing the use and availability of information disclosed through discovery. *Merrill Scott*, 600 F.3d at 1272. As discussed above, although *Merrill Scott* involved documents produced by a third party, and sought to be disclosed by the government, the parties to a dispute also rely on protective orders, which allow for the free and expedited exchange of documents in civil litigation. With the assurance that confidential documents produced in discovery will not be made public, will only be used in the present litigation, and will be destroyed at the conclusion of the litigation, parties get the benefit of exchanging information they can use to further their positions in the lawsuit. Thus, the overall system of civil discovery depends in some respects on the expectation that protective orders will be enforced and can be relied upon.

The importance of the reliance interest emphasized in *Merrill Scott* resonates in this case. The Resound Parties explain that they agreed to a broad protective order to allow the free exchange of significant amounts of confidential information that otherwise might have required close attorney review. Rather than spending the time and money to

8

examine closely, for example, the extensive financial documents and various emails on a document-by-document basis to determine what should be withheld on relevance grounds, or which represented highly personal confidential information, the Resound Parties produced large amounts of confidential information in reliance on the Protective Order, which ensured that the material would be used only for the purpose of this litigation and would be returned or destroyed at its conclusion. As Luke Reid swears in his declaration, "Resound Church produced its most sensitive financial and operational records in this litigation (including complete QuickBooks files, bank statements, credit card records, bulk email account productions, and personal text messages) in reliance on the terms of the Protective Order." ECF No. 291-3 ¶ 7.

Similarly, Resound Church settled the litigation in part in reliance on the assurances in the Protective Order which required the Harvest Parties to return or destroy all confidential and AEO materials within 60 days of the conclusion of the action. According to the Resound Church's Secretary/Treasurer, had the Resound Church Board known that the Harvest Parties would seek to modify the Protective Order after settlement, it would not have authorized the settlement on the proposed terms. ECF No. 291-3 (Declaration of Tony Nash).

The Settlement Agreement involved a substantial payment by Resound Church, to the tune of $360,000, and was intended to resolve all disputes between the Parties. Indeed, in connection with the Settlement Agreement, the Harvest Parties were required to release all causes of action of every kind and nature against all Resound Parties and Resound Church's officers, directors, employees, successors and assigns, through the effective date of the Settlement Agreement. *See* ECF No. 291-1 ¶ 2.1. In many

9

respects, the Resound Parties were buying peace. Now, by seeking to amend the

Protective Order, the Harvest Parties want to use confidential information learned in the

course of the litigation to stir up a criminal investigation against the Resound Parties.

This seems inconsistent with the intention of the Settlement Agreement, and confirms

that the Resound Parties would not have entered into the Settlement Agreement if they

had known that the Harvest Parties were going to open up a second front (this time a

criminal one) against the Resound Parties using information obtained in the civil case.

Weighing the importance of the reliance interest of parties to civil litigation

against the Harvest Parties' interest in showing confidential financial information to law

enforcement, the Court concludes that the balance of these interests weighs in favor of

respecting and upholding the explicit agreement made by the Parties when they

proposed the stipulated Protective Order in this case. The Protective Order will not be

modified. *See Data Digests, Inc. v. Standard & Poor's Corp.*, 57 F.R.D. 42, 44 (S.D.N.Y.

1972) (refusing to lift protective order to enable plaintiffs to communicate protected

information learned in discovery to government antitrust authorities). The Harvest

Parties may not use the confidential financial information obtained in this litigation in

making any report to law enforcement.

Of course, this is not to say that the Harvest Parties are precluded from going to

law enforcement to report what they believe may be violations of law. They just cannot

use or disclose confidential information from this litigation in doing so. If law

enforcement wants to use the many investigative tools available to the government to

further probe such allegations, then law enforcement may do so. *See Martindell*, 594

F.2d at 296 (explaining that the "Government 'as investigator has awesome powers'

which render unnecessary its exploitation of the fruits of private litigation," listing as examples grand jury proceedings, and the issuance of subpoenas for documents and witness testimony) (quoting *GAF Corporation v. Eastman Kodak Company*, 415 F. Supp. 129, 132 (S.D.N.Y.1976)).

As to the Harvest Parties' interest in the historic emails, which were designated Confidential and which the Harvest Parties claim to be their personal emails, this was an issue that could (and should) have been addressed in connection with the settlement discussions. The case is now settled, and all claims between the Parties have been released, including the Harvest Parties' claims that they should be able to retain access to their historic emails. To the extent the Harvest Parties now assert that these emails should never have been designated as confidential in the first place, that argument should have been raised earlier in the litigation, at the time when the trove of emails were first produced; not in the months after the case has been settled.

Counsel for the Resound Parties indicated at oral argument that if the Harvest Parties were to identify certain personal emails or groups of emails, the Resound Parties would be willing to consider de-designating those emails as Confidential under the Protective Order and allow the Harvest Parties to keep copies of those historic emails. That would be a gracious and appropriate thing for the Resound Parties to do. But they are under no legal obligation to do so, and the Court will not be modifying the Protective Order for that purpose.

V.    **Conclusion**

It is hereby **ORDERED** that the Harvest Parties' Motion to Clarify and Amend the Protective Order Pursuant to Fed. R. Civ. P. 26(c),ECF Nos. 283 (restricted version) &

11

284 (public version), is **DENIED**.

Dated: April 14, 2026

N. Reid Neureiter
United States Magistrate Judge